The next case on the calendar is United States v. MEDA. Good morning. May it please the Court. My name is Harry Sandek and I'm a partner at Patterson, Delknap, Webb & Tyler. I'm handling this case pursuant to an appointment under the CJA. My client, Mr. MEDA's conviction should be reversed and the case remanded for a new trial, and I'd like to focus in my time on two issues raised in our brief. First, the district court's ex parte meeting with a number of jurors, and second, an error in the jury instructions relating to Section 1325C, the marriage fraud statute. My colleague Bob Culp will argue the point relating to the jury instruction about whether there's a reason to distrust the defendant, which we also have made by inclusion in our brief. With respect to the ex parte meeting, in the middle of my client's trial, jurors raised a concern about something that my client had done in the parking lot. It's not exactly clear what happened. The district court decided to have an ex parte meeting with the jurors. This court explained in Collins that ex parte communications are pregnant with possibilities for error, and what happened after that ex parte meeting or during that ex parte meeting was such an error. The trial judge told these jurors that my client had acted inappropriately, that he had acted in a disturbing way. He suggested that they have a court security officer, therefore suggesting that they needed physical protection from my client. The trial judge did not tell the defense lawyers that he was having this meeting until after it had happened. During that meeting and afterwards, the trial judge never tried to figure out if my client actually did something wrong, nor did he ever ask the jurors if they could be fair, despite their belief, essentially, that my client was stalking them. So I think the district court didn't handle it appropriately. Is prejudice an issue, and what is the prejudice? Sure. Let me explain the prejudice, Your Honor. It was prejudicial here based on the nature of the case, and that this came down to, in large part, a credibility determination by the jury. Did they believe the testimony of my client and Esha Johnson, who denied that either of their marriages were engaged in for fraudulent purposes, or did the jury accept the cooperator's testimony? The cooperator here had flawed testimony. He had a history of substance abuse. He had a number of statements and recantations and restatements. This was not an overwhelming case, in particular with regard to my client, where much of the evidence of my client's intent with respect to his marriage to Mary was really circumstantial evidence about his role in Esha's marriage. And if the inferences are drawn for the government, they're still, in our view, and we've argued, I don't want to address it today, but we've argued that this evidence was equally consistent with theories of guilt or innocence. So the idea that my client says, well, I got my green card by marrying Mary, and the government says, aha, this is evidence of intent to commit marriage fraud. No, it's actually a description of how he got his green card, by virtue of his marriage. Your client did receive, or the defense counsel received a transcript of the ex parte proceeding. Am I right about that, during the trial? I'm not sure whether the record indicates that he did eventually. One, I think, can infer, perhaps, that he did, although at the time of the colloquy with the court, one of the defense counsels said, this is on Appendix 782, we don't know what the testimony, the judge hasn't told us everything they said. So at the time, right in the moment, they really didn't know what had happened in the ex parte meeting. And the problem here is that when the jury has to pass on my client's credibility, and they're told both that they need essentially to fear and be protected from my client by court security officers, and then told, and I'll let Mr. Culp address this, but also told that there's a motive to lie because there are defendants in this case, at some point, the ability to have a fair trial is lost. Collins talks about how even seemingly innocuous ex parte communications between the court and the jury can amount to reversible error. And given that so much of this came down to his credibility, a personal assessment by the district court, you know, that's disturbing. I've been doing this for years and years, and once in a while you get somebody that acts inappropriate like that. The ability to have a fair trial was lost. And I would also submit that if the court had followed the Collins procedures, they could have found out what happened. There could have been cautionary statements. No, no, no, they were holding back. They didn't want to, you know, intimidate you. They're just trying to get home just like you. My question is, and I agree, better not to have said inappropriate, better not to say disturbing, but this case, the conversation otherwise, bears some similarity to Gagnon, right? There's an ex parte proceeding, there was a defense lawyer there, but the jurors want to know something. Interactions are going to happen between jurors and the trial court in the course of a trial. If there's a transcript available, there was not a request later in the proceeding, judge, we'd like a curative instruction, we'd like you to make sure there's no misunderstanding about this. There was no request of that sort. And what are we to make of that? Well, I think it's very hard to undo what's been done through a curative instruction here. The judge, particularly when you read it on the transcript, was so forceful, he even tells the lawyers, in essence, tell your clients to stay the heck away from the jurors. One can imagine how this message was conveyed. The tone, of course, is missing from the transcript. How would it have helped the defendant a day or two later to have gone in and said, oh, remember when I told you that they were disturbing and now CSOs walk you out to your car every night? You actually shouldn't hold that against the defendants. You should try to be fair. Remind me of the time sequence after the judge, what time of day did the judge speak to the jury? So this is late in the day, it appears, because it says on page A769, jurors were excused at 436, and then there's a discussion in the jury room. And it seems to have happened The second day of trial? I believe it's the second day of trial, yes. And the discussion is held in the jury room. And then later on, it seems as if when the judge comes back out to have some colloquy with counsel at the end of the day, there's a Rule 29 motion that's made. This is the same day? This is the same day. The judge, at that point, discloses that he had the conversation, but this is the point where one of the defense counsel, Mr. Kelly says, now I have five jurors, they're deciding the case, they're nervous about how two defendants are following them. Another one says, we don't know what the testimony was, the judge hasn't told us everything they said. So at that point, rather than the district court saying, well, maybe you're right, maybe there's an issue here. Instead, the judge basically just says, looking at page 783, says, I'm just saying I want to make the jury feel comfortable, maybe they're a little nervous, but he never offers to do anything or backtracks on his conclusion that in fact my client was doing something wrong, which we don't concede that he was. He also said, I don't know why they're doing that. He said that to the jurors, too, in the transcript. He did say that, but then the very next sentence is, I mean, I've been doing this for years and years, and once in a while you get somebody that acts inappropriate like that. So when I read, I don't know why they're doing that, I take it as a rhetorical question of, how could they possibly be doing that? They shouldn't be doing that. But I concede that I'm reading into that sentence based on the following sentence and the prior sentence where he just says it's disturbing and that he's going to get CSOs to squirt them out. In the time I have left, I just want to turn briefly to the jury instruction issue. The Fifth Circuit has held that there is a circuit split on the question of whether, or essentially how jurors should be instructed on mixed motive cases. My client testified, he said, sure, I was in substance that I was happy that I could get my . . . The district court's charge here included a third element, and that is that there was a, that the defendant knew or had reasons to know that his or her conduct was unlawful and elaborates on intent, and this has to be a fraudulent marriage. Aren't those things sufficient to address the overall concern you're raising? Well, I think they do address the concern of whether the client acted, I'm just looking at the language on 1101, it says to establish this element, the government must prove that the defendant acted intentionally and purposefully with the intent to do something the law forbids. But I think the way the jury frames the question of what the law forbids will necessarily be influenced by the prior instruction about whether or not an intent to establish a life together is only a factor among others, or whether, if such an intent exists, whether that's exculpatory. So when we say the defendant should have known that their conduct was unlawful, I think it's still framed by reference to the language that the Ninth Circuit and the First Circuit and the BIA have all stated should be used here. This was a preserved error, and I think the Ninth Circuit has it right when they say that marriages occur for many different reasons and that there should be at least some instruction to the jury along the lines the Ninth Circuit has proposed. I see my time's up. Good morning, Your Honors. May it please the Court. My name is Eric Schillinger. I represent the appellant Mary Opoca, pursuant to a Criminal Justice Act assignment out of the Northern District of New York. I have the unique position standing here today of being the only attorney representing the appellants who tried the case. I was Ms. Opoca's trial counsel. The case before the Court is one that creates a unique question for Ms. Opoca. Was there a transcript available of the discussion with the five jurors during the trial? So, Your Honor, there was not that I'm aware of. If Mr. Kelly ordered that, he did not disclose that to co-counsel. We never saw a transcript. The judge came out. He said, and I'm not speaking verbatim from what he said in the transcript, but the perspective that he gave us was that there was a conversation that he had. He certainly did not tell defense counsel that he said that the conversation was one in which he described my client and Mr. Mehta's behavior as disturbing. He did not tell defense counsel that he didn't know why they were doing it in any kind of implicit way that was maybe negative. He said he had a conversation. He said that he advised that they would have security, and we went on with the trial. Of course, reading everything and reading transcripts after the fact is more alarming to me now standing here than it was in the minute and a half that Judge McAvoy addressed it with us before we were about to start cross-examination. When did you first see the transcript? The transcript of that conversation? When it was ordered on appeal, Your Honor. I'm sorry? When it was ordered on appeal, Your Honor. So, so far as you know, there was a, he came out and he said, I had a court reporter, this conversation took place in substance, but so far as you know, none of the defense counsel ordered the transcript and were aware of it during the trial. I don't believe so, Your Honor. I did not. And, and it was something that was based on the judges not giving any indication as to the nature of what the conversation was or what he said. If he came out and if Judge McAvoy said to us that I told the jurors that your client's behavior was disturbing, I would have asked for a sidebar and asked for a mistrial, Your Honor. We had no indication that that was some, some context of the conversation. Your Honor, I believe that the issue that is, is unique to Miss Opoka is one as to the question of the validity of her marriage. After trial, new evidence was disclosed by the assistant U.S. attorney who prosecuted the case. He provided to us in December of 2015 indications that they'd received from the American consulate in Japan, excuse me, in India, indicating that the decree of divorce that was relied on by the government as evidence in this case was actually fraudulent. The factor that is important in that is that my client, who is an American citizen, was married to Mr. Mehta, who had allegedly previously been married to the, the appellant Isha Mehta. The disclosure of the government's ultimately learning that the two Indian nationals were, were not divorced, they were still married, is factually material in a critical way to Miss Mehta's representation, to her defense. I would propose to the court that the first element of a marriage . . . Let's assume, I know the evidence doesn't, the record doesn't contain any evidence that she was paid, but let's assume someone in her position was paid and clearly her intent was to help someone get around the, the immigration laws through a fraudulent marriage. And it turns out that, that the marriage is void for, for this precise reason. I mean, is the person off the hook? Your Honor, I, I would actually propose that they should be. And factually, your hypothetical is distinct from Miss Mehta, from the evidence against Miss Mehta here. But even in a case where you have a clear sham marriage, the Second Circuit has said that the validity of the marriage is relevant. In 1963, in the U.S. v. Diego, this court held that the validity of a marriage is, is material to the prosecution for a crime where marriage is at issue. Now, that wasn't a marriage fraud case in particular, but it was an immigration case. It was a case where there was an allegation of falsely filing immigration paperwork where parties alleged to be married, and then they were prosecuted for lying on that paperwork because the marriage was deemed to be a sham marriage. In that case, the Second Circuit reversed it and it reversed and dismissed the indictment on the grounds that although, in that case, the parties were married, lawfully, it was not a lie to say that they were married on the immigration paperwork. It may have been a sham marriage, it may have been a violation of the charge that's here, but they were not technically not married, so it was not perjurous to propose that they were married when they filled out the paperwork. Here... The Second Circuit, though, prohibits knowingly entering into a marriage for the purpose of marriage, whether the marriage is valid under state law, and I'm having trouble. It seems like by your argument, I'm not sure that you could prosecute bigamy under New York law. Your Honor, under New York law, there's a specific exception for bigamy, and the Eastern District of New York has actually recognized that as well, so the federal courts recognize it also. Where you have a bigamist marriage... In every case where there was a legitimate original marriage without a divorce, and then a sham marriage, those folks could not be prosecuted for marriage fraud, on your theory. Yes, and the reasoning... Does that make any sense? It does because there are other statutorily prescribed crimes that would be applicable in that situation. The simple analogy is if someone is speeding, they're not guilty of petty larceny. If someone lies on marriage paperwork, if they say, I'm in a marriage, and they're not, then it's a different crime perhaps, but it's not a marriage fraud. This is a case where that exact scenario happened. Now, Ms. Opoka is in the unique position of having very little evidence against her at trial, having been deemed by Judge McAvoy to not be a member of the conspiracy for purposes of bruton. She's clearly along for the ride. After the fact, the evidence that is newly produced suggests that all along, her husband and the other defendant were married, they never divorced, and they produced all the documents that they used to allege that as evidence of their ability to marry my client. I think if this case was retried, I could present these arguments to a jury, and in combination with the lack of proof that she got any material benefit, the evidence that she... I would probably put her on the stand. I'd ask her to testify, and I would hope that she would testify, that she intended to marry him for legitimate reasons. She's since learned that she was ultimately a victim of this fraud, much more so than she was a defendant in it. I see I'm out of time, Your Honor. Thank you. Good morning. May it please the Court, Robert Culp for Esha Mehta in the indictment. Esha Johnson is referred in the trial and at the briefs. I was not trial counsel. I'm joining in Mr. Sandek's arguments in particular. I want to focus on the jury charge issue relating to defendants testifying. In United States v. Gaines, this court denounced any instruction that tells a jury that a testifying defendant's interest in the outcome of the case creates a motive to testify falsely. That denunciation was repeated the following year in U.S. v. Brutus. Five years later in U.S. v. Mazza, admittedly an unpublished decision, the court nonetheless found that the fact that the district court gave this clearly erroneous instruction five years after our decision in Brutus is highly troubling. This instruction undermines the presumption of innocence, which is not only one of the most fundamental principles of our criminal justice system, but also one of the principles most widely known and understood by the public at large. So I am making a . . . There's no . . . I don't think anyone quarrels with you about the inappropriateness of the charge, but why does this amount to plain error? It is plain error, and the government concedes that it's error that is plain. And I think the passage I just read, Your Honor, also gets me to the fourth element, which is the fairness and integrity of the proceedings. You're undermining the presumption of innocence. I think the crux of the matter is the third element of the plain error, which is the prejudice, Your Honor, affecting substantial rights. This is a case where this was a he said, she said case. Isha Johnson took the stand, testified, saying that Brandon Johnson, who said that this was a phony marriage, was not testifying truthfully. Brandon Johnson . . . I know the government thinks that their case was airtight, and they tend to say that in most cases, but Brandon Johnson was not someone whose testimony is above reproach. Brandon Johnson admitted that before the immigration inspectors knocked on the door that morning, he had been up all night drinking and smoking marijuana. He was distraught over the death of his grandfather, with whom he was very close. Although he admitted that day, purported to admit, that the marriage was fraudulent, he retracted that in two different statements, one of which was typed, and I believe he tried to say in cross-examination, well, that was done by Isha. But then there was another one in his own handwriting, which he admitted. So this is not an open and shut case. This is a case where putting a thumb on the scale and saying to the jury, in effect, well, we all know that defendants have a reason to lie in criminal cases, was severely erroneous and prejudicial. There's some other aspects of the case that I want to point out. Brandon said, well, Isha never lived in my apartment. Well, Brandon's own work friend testified as a defense witness and said that, yes, she was the one who was sleeping on the couch. Those were her clothes that were seen by the immigration officer. But she said that Isha was also living there and staying in the bedroom, not every day of the week, but she was also living there as well. So this is not a case where I think you can say, well, let's just see. I mean, this really goes to how strong the evidence is. If you step back and look at the big picture, you have the two coming with their son on tourist visas. They appear to be coming in as a family. They're living together as a family. The husband and wife are working at a mini mart together. And then they each wind up in these somewhat unlikely marriages. I mean, it certainly feels like marriage fraud. The government makes those arguments. They have a case. These are private matters. They're difficult to unpack. You're talking about what was described as an arranged marriage by both of the defendants who testified that they were sort of . . . Is it likely that Johnson and Isha fell in love and got married for that reason? For what reason? Because they fell in love? Yes. That's what they testified. And I don't think it was appropriate for the district judge to say, well, this one over here and the other defendant too have a reason to lie. I don't think that it was appropriate to put a thumb on the scale. Well, I agree with you on that. The question then becomes back to prejudice. Back to prejudice. Yeah. You know, I'll just throw this in. I mean, have you ever heard of the phrase happily divorced couple? I know some. There are couples, especially when they're involved in co-parenting, where they are . . . still have to do things together. And in this case, there was a common apartment where we're raising the child. That may all be true, but the jury is charged that this was . . . the government has to prove that this was a fraudulent marriage. And there has to be evil intent and intent to break the law and the jury convicts. Yeah. I just go back to my original point. I think you've got a he said, she said, where the he in this case is someone who, like I said, was up all night drinking, retracted his confession twice. And so there's a real issue there on the he said, she said. It's not an open and shut case at all. I think there was . . . there's enough prejudice here that I don't think that the flaunting of the denunciations in Brutus and the other cases should be disregarded. Can I just ask, your client did make a mistrial motion based on the . . . On the jury, yeah. And by your read of the record, do you think that was with the benefit of a transcript or without? I have to defer to Mr. Schillinger on that issue. I do believe, from what I recall, that they didn't get the benefit of having that transcript until sometime after the trial. I was not going to argue that point. No one ordered daily copy, I gather. I can't answer that one way or the other. Maybe he can. I do want to just quickly state, I wasn't going to argue this point, that yes, in my client's case, the trial counsel did make a mistrial motion. So I don't think the plain error review applies to my client, at least, because of that motion being made. And also, even though she was not . . . it was after the Rule 29 motion, as I recall. It was not in real time when they were discussing this in court. I think the Rule 29 motion was made and then he had a chance to reflect on it. I think because he was thinking, well, this wasn't my client who was one of these two people who the judge made the disparaging . . . the two other defendants who the judge made the disparaging remarks about, but I think he thought, well, this is prejudicial spillover towards my client, who after all is accused of being in league with at least one of the other two defendants. So she's part of these inappropriate remarks. If I could jump on the . . . I see that my . . . just very quickly on the marriage fraud statutory issue, which was properly preserved. Mr. Sannick made a number of the points that I would have made. I just want to comment on one thing. The government says that, well, we shouldn't be adding additional concepts or language beyond what the statute says, which is for the purpose of evading immigration laws. But courts do this all the time to prevent statutes from being construed in a way that are vague or could lead to untowards convictions, including the mixed motivation type marriage that we've talked about. I cited in my brief the Skilling case, which I realize is not marriage fraud, but there you have a statute that says honest services. What are honest services? And what the Supreme Court did with that is they said, well, we can supply some content there. Rather than strike the statute, we'll say honest services applies to bribe and kickback schemes, which is what they did, which had been based on years of interpretation. And I think this phrase, did not intend to form a life with her spouse, did not spring out of thin air. It's a phrase that goes back to the Supreme Court's decision in Litwack and . . . Yes, it's supplying essential content, as the Ninth Circuit has recognized. Otherwise, you're inviting these mixed marriage convictions where someone . . . of course, my client also testified that, yes, it was a benefit to know that I could resolve my immigration status, but that alone shouldn't make marriage fraud. May it please the Court, David Goodham for the United States. Addressing first a factual question and then moving on to the law. With respect to the transcript issue, I think the record is silent on whether there was any ordering of the transcript. This happened, as I understand the chronology, at the end of the day on Thursday. I don't think the Court sat on Friday. There were closings thereafter on Monday, with further . . . two of the defendants closed on Tuesday, and then the jury's verdict was at Tuesday. But critically, the judge started off his conversation with counsel by alerting them to the fact that a stenographer had been present, and there's a record of everything they said and that I said, and that's at A-771. But yet, over the course of the weekend, the other two days of the trial, and indeed, in the months after the trial, it does not appear that any transcript was ordered. And I think that's why we're here on plain error review. Defense counsel could have acted on this ex parte conference. Defense counsel did not. And in fact, interestingly . . . The trial court didn't disclose that he had used words like disturbing and inappropriate. Sure. And if he had, there probably would have been a different kind of response. That's possible, but I think it's incumbent upon . . . to avoid the kind of situation we're in here, it's incumbent upon defense counsel, when alerted to a conversation of this ilk, to take it upon themselves to check. That's absolutely wrong. It's incumbent on the district court to tell counsel who were not present what happened. And this was a significant encounter. Sure. In some ways, it was a defense counsel's worst nightmare, because these jurors, you know, were obviously concerned or indeed even afraid of these brown skinned people. And that is a defense counsel's worst nightmare, that that will drive the conviction. And on top of that, the judge gave an instruction about motive to falsify that this could not be clearer. And so, what you have to help me understand is why that combination of circumstances does not impair the public's confidence in these proceedings. Sure. Because it wasn't an objection, and as the defendants concede, we are here on plain error view. That means the defendants have to convince this is a probability of a different outcome. My first response to your suggestion, Your Honor, is that if you look at the court's comments, they are ambiguous. The defendants are suggesting they have the worst case scenario associated with them. The government has proffered in its brief why there's another take on those comments. When the judge said, that's disturbing. There have been at least an inquiry as to whether the jurors could be fair in rendering a verdict after this whole discussion? I think that could have been an option, but again, defense counsel Could it have been the option? Well, we have at the end of the colloquy with defense counsel in the in-chambers, when defense counsel were there, we have the court's suggestion that, and this is at page 781, there's nothing in what she, my clerk, told me, or what I heard from the jurors that would make me think they made up their minds about guilt or innocence, and that's at page 781. He couldn't have known. He made no inquiry. Well, he was there. He was looking. He can't make up their minds. No, but he can look at the comments that they made, and I think this supports the conclusion that he draws at 781. If you look at the comments that the jurors made, they're not particularly, they're fairly innocuous, I would suggest, and in particular if you look at page 770 of the record, one of the jurors says, it's a little uncomfortable. Another juror refers to lollygagging. Another juror refers to lingering and staring. I mean, I don't think these jurors were suggesting these worst case scenarios. These are people that make me nervous. The way they look at me makes me nervous. Well, again, and this was something that the court, you know, taking it outside of the context of this particular trial, this court said on the record, you know, I've had this happen before, so I don't think, and in fact has assigned CSOs to jurors before. That reinforced it, because he's telling them now, I'm going to give you protection. That reinforces the notion that you have some justification for being suspicious of these brown-skinned people. Well, again, I think this is a tricky situation for a trial court, and I think the It's a workaday situation for a trial court. I would disagree. In terms of things that trial courts handle, this is easy stuff. Actually, I would disagree, Your Honor. You haven't been a trial judge. I have. It's easy stuff. I certainly understand. I would suggest that the Supreme Court in Gagnon suggested that this is a tricky situation. In Gagnon— Look, I've had this situation. I mean, I've had it. It's easy stuff. Well, in Gagnon, the court recognized that when you have a juror who approaches a trial court, enunciates concerns about a defendant, the court in Gagnon was quite clear it could be counterproductive, the court said, to have the defendant present at the ex parte meeting, and that's the tricky situation I'm suggesting. There's nothing counterproductive with alerting counsel that my clerk got this report from some jurors. What should I do? This is what I propose to do, and give counsel a chance to be heard on it. Sure. And then you could discuss whether the defendants can be there or not, but at least there's an opportunity to discuss. Counsel could then say, Your Honor, should inquire as to whether the jurors still can be fair, and then the judge wouldn't be in the position of trying to read their minds. Sure. And look, if we could all, in retrospect, certainly that would have been the more comfortable way for this to unfold. Does Gagnon require that that colloquy take place before an ex parte meeting of this sort? No. In fact, three of the four defense counsel in Gagnon were not present, and the Supreme Court still approved of that meeting between the juror and the judge. Again, I think that's the sort of . . . when a judge is . . . In that case, remind me, in that case, one of the defendants was sketching jurors? Yes. Yes, and apparently, one of the jurors noticed, made communication with the judge, and the judge had the conference ex parte with one defense counsel. It is true, but no defendants and three of the other defense counsel. In that case, there were not statements like, This is disturbing or this is inappropriate? No. No suggestion of that. Counsel must have been advised in advance because one of the defense lawyers was present. That's true. That's true. The judge said it from the bench. I'm going to meet in chambers with . . . and ask one of the defense counsel to come back. You know, we are in the context of plain or obvious error, and I would suggest that the defendants have not shown a real improbability of different outcome for a couple of reasons. But even before I get to that, I want to emphasize this. They must show plain or obvious error. I would suggest that the Court's comments are ambiguous. They don't necessarily bespeak prejudice. I've made that argument in my brief. I've tried to reiterate it here. I think this is a Court trying to do . . . to deal with the jurors' concerns in the best way possible. The defendants have suggested the worst case scenario with respect to those comments. The government has proffered an alternative explanation. But we have to . . . the defendants have to show those comments were so obviously prejudicial. That's what I would suggest. Could you remind me of what your alternative explanation is? Sure. If you look at the . . . I'm at page 769 and 770. Two points. First, it is true that the Court, when initially confronted with the description of lollygagging, he says, that's disturbing. But then about ten lines later, actually four lines later, he says, I don't know what's in there, referring to the defendants, and I think he's about to finish the sentence, say, I don't know what's in their minds. And then a couple lines later, and this is on page 770, he says, I don't know why they are doing that. I would suggest that that was maybe an inartful way of . . . The next sentence is what's troubling. I've been doing this for years and years, and once in a while you get somebody that acts inappropriate like that. Sure. And again, I think that's ambiguous because once in a while you get somebody that acts inappropriate like that. I mean . . . Again, I don't think it's obvious. I think when he says in the abstract . . . Well, what he says is every once in a while you get somebody that acts like that. And so at that point, it's sort of third-party objective. But again . . . He's saying that somebody's acting inappropriately. That's the normal takeaway from that. That's certainly one inference, for sure. Let's turn the page to the third prong of Alano. And that is the defendants must show a reasonable probability of a different outcome. There are several features of the record that I think show the defendants have failed to do that. Number one, as I've already discussed . . . I think your opponents have an uphill battle of minimizing the strength of the government's case. But the fact that the government has a strong case doesn't seem to erase the bias and prejudice on the part of jurors. Actually, I wasn't going to beckon to the strength of the government's case to suggest that they had not met their burden. My first point . . . If the government had a strong case and these jurors had come in and the judge said, look, yeah, I get it, these people look dangerous to me, you've got to be really suspicious about them, I'll give you security. I'll have the CSO of the marshal take you back and forth to your cars every morning. That would still be troubles. Well, I think the instructions here are really the key to the no prejudice analysis. First part of the government's no prejudice analysis I've already talked about. We think the court looked at the jurors, assessed the situation and said, I don't think we have bias here. That's number one. Number two, if you look at the instructions, the court was quite strong in its admonitions to the jury both before and after. At the record A257, the court before any of this unfolds preliminary instructions says, nothing that I do or say during the course of the trial is intended to indicate or should be taken by you as indicating what your verdict should be. That's a matter entirely up to you. The court reiterates that after the case before closing arguments. Judge says, anything you may have seen or heard outside the courtroom is not evidence, must be disregarded. Before the case begins, the court says, I'm sorry, the final instructions will be violation of your sworn duty as judges of facts to base a verdict on anything but the evidence in this case. And then again at 1087, anything you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded. You put those instructions, which this court must infer that the jurors adhere to, absent any evidence to the contrary, put those instructions together with what I would say was essentially a no bias finding on the part of the court at the end of the colloquy, coupled with the strength of the evidence. And I think what you have here is a situation where the defendants have not met the third prong of Olano. The evidence was pretty strong with respect to, in particular, Isha and Guarev Meda. With respect to Maria Poca, we of course have the very damning admission that Guarev made on direct examination. Put all that together and I think we have a cleansing of anything that anyone knew on behalf of the defendant and fruitfully, guilt illegal or beneficial was in this case was certainly well known to the judges. And there are still those sorts ofances, but the emphasis is certain  mean that the defendant was offended.   The one we've conceded plain error, yeah, well, this court has taught us that I think in Maza that it can be harmless error and in fact can be in Brutus said could be harmless error when you have overwhelming evidence and the case didn't boil down to the credibility of the defendant. Um, Esha was one of the people who took the stand and testified Esha made a, I would suggest this is really, um, um, there's, there's, there was overwhelming evidence. She was part and parcel of the cash for marriage scheme, drummed up with Brandon Johnson and several features of the government's case corroborated that cooperating, cooperating witnesses testimony. Most importantly, we have, um, officer savory's account of what happened when Esha was arrested. Um, well not arrested, but cited for the traffic accident and the extremely suspicious circumstances that unfolded thereafter when she initially gave the Dutch village address and the next day said no. She initially said, I'm not, uh, my name is by my maiden name. Then she says, um, uh, you know, I'm not going to give you my last name. And finally, when asked her husband's name, she refuses and says, well, that would get him in trouble. We also have agent lands testimony of Brandon Johnson's, um, contemporaneous confession that he married Esha for immigration purposes. Um, and then of course we have Esha's lies on, on the, the US CIS forms. Put that together with her testimony, which is sort of the other piece of the puzzle here. When you back out and you look at the whole record, her testimony essentially boiled down to, uh, my immigration lawyer screwed up. Um, that's essentially what it amounted to. Yes, um, uh, uh, uh, I told him that I was not residing here, but, um, apparently he didn't listen and I didn't look at the forms carefully. All that together, I think, put this, this case in the Maza category, um, in terms of, uh, they have not shown a reasonable probability of a different verdict, um, on these facts. Um. Isn't this a candidate of structural error? Structural? No. I mean, and I think this court's case law is very clear on that. This is, you know, Brutus says you can even look at this in a preserved error context, but Maza, Maza says you can certainly look at it in a plain error context. Um, and, and that makes perfect sense. I mean, to the extent that you're trying to assess, well, did that instruction have any impact here? And if the government's case is overwhelming, and this court in, in, in Maza went through the counts very carefully, said two of the counts actually were going to reverse. The other two counts were not going to reverse. Um, here, when you do that analysis, as, as reflected in the briefs, I think you can come to the conclusion that, uh, with respect to the two counts, um, for Isha Mehta, you can affirm those. With the three counts for Aguara, if you can affirm those. Um, if I could just, uh, briefly, I'd be happy to answer any other questions on, uh, actually, one thing, one thing I want to, one note I want to make, one of the reasons that we're in a little bit of a fix here with respect to, um, um, a vacuum on the record is if you look at, uh, turning to the ex parte conference, um, if you look at, um, page, page 782 of the transcript here, at the very end of the entire colloquy, um, we have defense counsel for Aguara of Mehta telling the court, well, first the court, first he says, well, maybe I want to have my, my, my client apologize on the stand, and he asks the court, do you think I could do that, and the court says, well, I don't, I don't know, and then this is, and I think, I think this is important, at the next, next sentence, he says, well, we can deal with it, let me talk to my clients and find out what's going on here. Um, so, there, there was a suggestion at the end of the entire colloquy that they were going to figure out what, what unfolded, um, and maybe deal with it that way, so, um, I think that's part of the reason we have the, the blankness that we have here with respect to the record. Let me, uh, remind me from, uh, uh, jury voir dire to verdict, this case took how long? I think, uh, if I might be honored, um, I think it was, voir dire was on, I believe on a Tuesday, there was testimony on Wednesday and Thursday, they took Friday off, I think closing, and, and defense case was on Thursday, I think closing instructions were on Monday, and then final closing arguments on Tuesday morning, and I think we had a verdict by two on Tuesday, so I think . . . A little less than a week. Yeah, for sure. Um, if I could just . . . I, I think that covers the points I wanted to cover, I don't want to take up the Court's time unless the Court has any further questions. When you say that the, the colloquy are in 782 or 781, so your point is basically just that, uh, there was discussion of this at trial, the Court offered to call, you could have Ms. Price say what the jurors had, had indicated to her that led to this exchange, and the defense counsel just didn't . . .  . . . make any effort to supplement the record. Yes, absolutely, but most critically, when the judge started his in-chambers conference with defense counsel, he said, I had a stenographer there, um, and apparently the, the defense counsel sat on their hands thereafter, um, and that, that I think really leads . . . . . . um, uh, you know, this was . . . I'm sorry, Your Honor. Uh, no, okay. Um, we would ask that you affirm the convictions of the defendants below. Thank you. Thank you, Your Honor. I want to turn to the subject of, of prejudice. Um, this was not an obvious marriage for our case as to my client and Mary Apoka. Indeed, immigration authorities had already conditionally given him a green card, uh, after going through the initial stages of the application process. And on pages 40 and 41 of our brief . . . So, sir, at what point was he approved for a green card? He was . . . there was a conditional approval after an interview with, um, the immigration authorities. Uh, that was obviously undone when all of the proceedings in this case happened. But there was an initial, um, there was an initial approval. But none of these events had happened at that point, right? Um, I think they were happening on . . . I think some of the Esha Johnson events happened, um, roughly contemporaneous with his own approval. I, I don't, I don't want to . . . Yeah, I guess I don't see how that helps your case, the point that he had gotten a green card. The government's theory at trial and the proof, uh, went to establishing and the jury accepted that proof that it was based on marriage fraud. Well, the, the point of our argument is this. The bulk of the evidence at trial that was inculpatory as to our client was the evidence about the Esha and Johnson marriage. It was not the evidence about my client having entered into a fraudulent marriage. And we recount that evidence on pages 40 and 41 of our brief. That the evidence that was reviewed by the district court when it denied the Rule 29 motion on sufficiency of the evidence. Things like that he went, Mr. Mato went to assist his ex-wife when she had an auto accident while driving their son. Um, as if, you know, a kindness shown by an ex-spouse to another is proof that his own marriage was fraudulent. Or that Mary Apoka said welcome to the family when Johnson, uh, married Esha. As if that was somehow a covert signal that her own marriage was fraudulent. It's a lot of these very, uh, indeterminative, uh, pieces of evidence that are sort of stacked one on top of the other. And it isn't a matter of when the evidence, um, is, you know, drawn in the government's favor. You draw inferences in the government's favor. You should therefore conclude that there was no, uh, no prejudice here. It's that the evidence was incredibly equivocal. And the inferences you can draw were equally consistent with guilt or innocence. And so again, as Colin said, even seemingly innocuous ex-party communications can still amount to unfairness. And here, the boilerplate instructions cited by the government were not enough to cure the problem. The defense lawyer- I think the court should look at those cumulatively because they play into each other. Both of them essentially are ways of undermining the defendant's testimony. And there was no reason for defense counsel to go back and order that transcript when the court says I told you everything. I'm sorry. The court says on page 782 of the transcript which government counsel was citing, at the very bottom, my client's trial counsel says we don't know what the testimony. The judge hasn't told us everything they said, referring to the jurors in the ex-party meeting. And the court says I told you everything that I thought was having to do with the issue of what I had to do to make them feel comfortable. When was that statement made? Sure. It was on page 782, a few minutes after the ex-party conference. So the district judge is actively encouraging counsel, don't worry about this, based on an incorrect- I'm not ascribing intent, but an incorrect description by the district judge. It's understandable on those circumstances that the lawyers wouldn't have rushed out to get the conference because the district court told them that he had already disclosed everything and, in fact, he hadn't. Well, he also told them we can have my assistant testify, tell us what the jurors told her. The defense counsel clearly did not rush to get a full record on this. I have to concede that that is also part of the record.  Thank you. With respect to the realization that the divorce decree that I now am relying on as new evidence to warrant a new trial was not new evidence. There is an enormous, enormous void between a cooperating witness who is a drug addict and alcoholic saying, oh, yeah, they made that up somewhere, I heard, and a federal prosecutor, after the fact, sending me correspondence that absolutely confirms that that divorce decree is not something that was procured legitimately. The government relied on the fact that divorce was real as evidence that there was some overarching scheme here. It didn't seem to make sense to the government that two Indian nationals would marry in India, divorce, and then shortly thereafter move to the United States and live as a family. The knowledge that that divorce decree was absolutely fake would certainly change how this case would be defended in a material way. If we knew that, this entire trial would be constructed in a different way. Very quickly, again, as to my client, I don't concede that the juror colloquy issue is a plain error review because of the motion for a mistrial. I do think, Your Honor, that your question is dead on about are the issues linked. Yes, they are. You've got one earlier in the trial, you've got the judge making disparaging remarks about a couple of the defendants. I think, Judge Parker, you said that that undermines the presumption of innocence. Well, on the jury instruction issue that I've been arguing, it's the exact same thing. So I think this is a case where two issues really do, the prejudice augments. Opposing counsel said that, made reference to some of the cases in terms of prejudice on the argument that I was focused on. In the Brutus case where the court did not overturn the conviction, the defendant had been caught at the airport with drugs, confessed right then and there, and Judge Glasser, I think, said at sentencing it was the most incredible perjury. That's an open and shut case. Or even in the Maza case, which there was discussion where some counts were overturned and others were not, the ones that were not overturned were document cases. I think one of them was an obstruction case where clearly subpoenaed documents were not turned over. It didn't really turn on that defendant's testimony. These were not turned over. And the other one had to do with asbestos false filings that, again, were document intensive. As much as one emphasizes the government's case, she still was testifying against someone who had serious problems with his credibility, with the overnight drinking session and the confession and the two retractions. Otherwise, I rely on my brief to respond to some of the other points that were made, and I thank the court. Thank you all, and thank you for your CJA service. Very well argued. Thank you all.